The trial court's decision should be reversed. Under the section of CAFRA, Congress entitled exclusively... The trial court's decision should be reversed. Under the section of CAFRA, Congress entitled The trial court's decision should be reversed. Under the section of CAFRA, Congress entitled by customs as well as... I don't think there's any dispute of that. Well, there may not be a dispute, but that doesn't mean that it's not important to know what the term means. Officially assigned could mean if somebody says, well, you're expected to wash your towels in your own time. That could be officially assigned work now. Well, doesn't everybody have a job description? Virtually everybody in the government has a little paragraph that's attached with their position? Yes, Your Honor. Is that what you mean by officially assigned? Everything that's within the job description but nothing else? No, Your Honor. The position description describes the duties and the types of things that the CEO would be required to do even if a CEO were to perform those types of duties if they were doing it off duty. Let me ask the question this way. Were these officers officially assigned to clean the rags that the dogs use? That was one of their... Yes or no? No, Your Honor. If they arrived at work with dirty rags, would they be applauded or would they be criticized? The CEOs were expected to have clean towels available for their use. So how were they going to get clean towels? They worked... Were they authorized to purchase them at the market on the way into town? A way to work? No, Your Honor. The port did provide towels. Obviously not an infinite number of towels, but the port provided towels and the CEOs were expected to have clean towels available for their use. I'm still coming back to my original question. How do I know what officially assigned means? This is an issue which would seem to be very important to the question of whether this is an exclusive statutory scheme or not. Officially assigned has a very narrow interpretation and only would cover something where the boss writes out the requirements and says you shall do this and it's all documented. That's one thing. If officially assigned is a broad term that would include expectation that you have the towels washed at home and things of that sort, that's another. But nobody addresses what officially assigned means and I wasn't able to figure out what it means. How am I supposed to figure out what it means? Your Honor, I think it can be attributed to the general use that we would assume officially assigned means, which is directed by a supervisor to... Well, if you're going to get fired if you show up at work every day with dirty rags, which is what you in essence told me. If you're going to get fired if you show up with dirty rags, well then you're expected to wash the rags. I would think you'd be assigned to wash the rags. Yes, Your Honor. And if that were the case, then they would qualify for double time under the COPRA statute, correct? I don't think that that is what the plaintiffs have ever alleged. They're entitled to COPRA overpaying for the type of work that they perform. They're claiming that this isn't... Why did you not pay them overtime, the government? Because COPRA is the exclusive overtime statute for CEOs and it requires that work be officially assigned. And so you say this work was not officially assigned? No, Your Honor. But you don't deny that the work was performed? We are not contesting that much of this work was performed by the CEOs on their off time. Below, you contested whether this qualified work at all that would be able to even pay for, right? Right. But you've waived that now. At this point, we're conceding that the types of activities that the CEOs performed would be considered work. In fact, under the FLSA and the authority under that, work is a very broad definition, right? Yes, Your Honor. So come back to me. What's the answer to my question about what officially assigned me? Why doesn't it include a lot of the work here for which recovery is being sought? One way to answer your question, Your Honor, would be to reference the purpose of COPRA, which in part was to reduce overtime abuse and CEOs and customs employees effectively signing themselves up for overtime and certifying that the work had been performed. Congress wanted overtime to be limited and it wanted to be well-supervised and well-managed. So I think that our position that COPRA overtime is limited to overtime which was approved by a manager or supervisor and not— Wasn't some of this work approved by the manager? They knew it was going on. They encouraged people to do it. Why wouldn't that be approved by a manager? I'm not understanding. Because again, Your Honor, this would be really against what the purpose of COPRA was, which was to rein in abusive overtime. Isn't that satisfied by the cap? Well, it's certainly addressed by the cap, Your Honor, but if we have a dual, a hybrid situation that the trial court and the plaintiffs contemplated in which certain types of work are performed and compensated by double time overtime and other types of work are compensated by FLSA time and a half, then we've come back to the same distinction that Congress intended to abolish when it enacted COPRA. Well, now I'm confused because it's explicit that there shall be no additional time other than that which is officially assigned. And I thought I heard you respond to the questioning that they were required to come with the clean towels. Your Honor, perhaps I misspoke. I don't think we're contesting that the CEO's requirement of doing their job successfully is having clean towels. And everyone knew in the post in which there were no washing machines that they were doing the cleaning on their own time. I don't think there's ever been any suggestion that nobody knew what was happening. No, Your Honor. But again, if there is no reason for the management to stop the CEOs from performing this work on their off-duty time. But they're prohibited by regulation from going beyond the official hours other than what's officially assigned. And therefore, we're within the overtime provision. It doesn't really fit together, does it? As to why these particular plaintiffs chose the FLSA, there may very well have been tactical reasons that are not stated in the briefs. But in either case, the proof is going to have to be the same, isn't it? That this was a requirement of their position. And at the time, I gather that there is now no base that doesn't provide washing machines on site. Is that right, that all of this ended in 2004? The claims ended in 2004 when customs instructed all the field offices to instruct the CEOs not to perform this type of work. So, post-JAXTA, the towels are laundered and the teaching aids are manufactured during the ordinary eight-hour workday. Yes, Your Honor. Correct? And they're being paid for that? Yes, Your Honor. Regular time? Or it was performed by others. Now, are they being paid for watching the washing machine when it goes around and around and around? During their... During their ordinary eight-hour day, yes. The answer is yes, isn't it? Well, presumably because if they are doing that work, they're doing other work at the same time. Well, we don't know that. Well, there's nothing, Your Honor, there's nothing in the record to my knowledge... Are these people assigned to do something? They put the rags in the washing machine, they turn the cycle on. Does the supervisor then come over and assign them additional work to do while the cycle's going through? Well, I can't address that except to say that each of the CEOs have certain responsibilities throughout the day that they're required to perform, such as paperwork and cleaning and other activities that can be performed at the same time. Now, before JAXTA, if you had a CEO that had his normal eight-day workday, finished the eight-day workday and he had the dirty towels and he didn't have any new teaching aids, he would have to make them at home in order to come to work the next day in a satisfactory way, right? If they were required for the next day, they would need to be ready... And since they weren't being washed and the teaching aids weren't being pre-JAXTA, were not being made and done during the eight-hour day, right? Yes. It had to be done at night, otherwise the person couldn't arrive at work without risk of being sanctioned. Yes, Your Honor, but again... So that's either work suffered for purposes of FSLA, right? Or perhaps it's even work officially assigned if we knew what officially assigned meant. In fact, under the plaintiff's view of this case, you actually get more under the FLSA than you do under COPRA for the same work. If we considered the washing of the towels to be officially assigned work, COPRA limits that to double time, right? Yes. But FLSA allows triple time, unless the government can establish good faith. They're liquidated damages. Correct, Your Honor. Well, how could Congress possibly have intended to give triple time for work informally performed and only double time for work that's officially performed? That makes no sense, does it? No, Your Honor. And for the same reason, Congress didn't intend to have a hybrid compensation system in which the pay would be based on the types of work performed. But did Congress intend to have these people do an essential part of their work for free? If they don't have time during the eight-hour day to take proper care of the towels and whatnot, right, then it has to be done. Did Congress intend for people to just work for free? Congress intended that overtime be limited to officially assigned work. Well, you're not answering my question. Did the Congress contemplate that these particular people would work for free for an essential part of their work? Well, no, Your Honor. Well, then how are they going to get paid? They're going to get paid by officially assigned work, and there's nothing in the record that suggests that. Well, it's a great catch-22. Then what the agency does is it has very few officially assigned things, just barely enough maybe to keep you busy, and then all the important things take 20 or 30 hours you have to do on your own time. Well, Your Honor, there's no suggestion that there's any sort of bad faith abuse of COPRA, which is intended to provide generous compensation to the state employees. Well, that's not the way the trial court judge saw it. They saw an absence of good faith. Well, and that is one issue we would like to address, although I see that I'm in my rebuttal time. Yes, you are. Are you not perhaps satisfied with the answer? Let's hear from the other side, and you have a couple of minutes left. May it please the Court, my name is David Kern. I'm sorry. Yes, go right ahead. I would enjoy the opportunity to answer some questions. How could it be that Congress capped the overtime at $25,000, but intended that only to be a cap on COPRA payments and not FLSA payments as well? Well, I think it comes back to the sufferer permit standard that I know you wrote about in the Doe decision. It was in dicta. I appreciate that. I think that's a very important decision for this case because— No, but that's not really answering my question. How could it be? There's a cap of $25,000 a year. I think maybe it's been increased to $30,000 by some of the appropriations. How could it be that that cap would only apply to payments under COPRA and that it would allow you to exceed the cap by getting part of your overtime under the Fair Labor Standards Act? How could it be that Congress would intend that? Well, that's a good question, Your Honor. I think practically speaking, just to speak practically about it, the sufferer permitted overtime that was performed under the FLSA couldn't practically speaking exceed the threshold, I don't think. There was a lot of overtime performed under COPRA as well. But what you're saying is somebody's bumping right up against the cap under COPRA payments. He's got $24,999 worth of overtime in a year that he can nonetheless recover unlimited amounts in addition to that under the FLSA because the cap doesn't apply to the FLSA overtime. Well, theoretically, you're right. But this all comes back to the employer's responsibility to control the work. That's what the FLSA is all about. That's why the FLSA recognizes sufferer permitted overtime. I think you're absolutely right. If the employer fails to control the work and allows this sufferer permitted overtime to be performed, that could happen. The other question is how could Congress have possibly intended? Let's say somebody is assigned an extra shift and he says, I don't think I'm going to claim overtime under COPRA for this. I think I'm going to wait and claim overtime under the FLSA because I can get triple overtime, including the liquidated damages under the FLSA, whereas under COPRA I only get double overtime. Can somebody do that? Practically speaking, you don't get triple overtime unless you do all the things my clients have done and come to court and try a lawsuit and win. You're not going to get triple overtime. The liquidated damages are the— Can somebody answer my hypothetical? Can somebody say, I'm not going to put in a COPRA claim because it only gets me double overtime. I'm going to put in an FLSA claim and get triple overtime. Could somebody hypothetically do that? Yes. Yes, they could. Could Congress possibly have intended that to happen? Well, you have the same situation under FIPA. Under FIPA, the FLSA works in concert with FIPA. You can get paid under FIPA and get paid under the FLSA. That happens. There is a specific regulation that basically says the FLSA works in concert with other acts. That's 5 CFR 551.513, entitlement to other forms of pay. It says an employee entitled to overtime pay under this subpart. It's talking about the FLSA. An overtime pay under any authority outside of Title V, United States Code, shall be paid under whichever authority provides the greater overtime pay entitlement on the work week. So the guy can get triple overtime even though COPRA says double overtime. That seems kind of odd. Why isn't the answer— It shouldn't happen. And the reason it shouldn't happen is an employer shouldn't do what this employer has done in this case. Suppose this problem doesn't come up after the JAXTA memo. I was just going to say, Your Honor. They cured themselves. This employer realized they were doing the wrong thing. That's why the JAXTA memo came out in June of 2004. That's why they went to all the trouble to issue a national directive to every court, to every supervisor, and to every CEO saying stop doing this. You cannot have these people working like this and not pay them. And even before that, in our brief, we talk about the March 2001 audit, court audit, that took place in El Paso where the then head of the national program, Mr. Newcomb, went there and saw that they were doing this and told them to stop it. It's in writing. It's in the appendix. Why didn't you claim the overtime under COPRA itself? Is that because COPRA only applies—gives double? No, it's because as we—I guess we're giving the government the benefit of the doubt here. As we interpret COPRA, it talks about officially assigned work, and we make a distinction, as did Judge Hewitt, between officially assigned work and separate and permitted work. The way I view it— What's the basis for that distinction? The distinction is—well, there's a lot in the briefs about that. Well, I've read the briefs a couple of times. I don't see anything in the briefs about it that tells me why officially assigned is given the cramped interpretation that both you and the government give it. It doesn't make any sense to me. Well, I think what Judge Hewitt said, and I'm inclined to agree with her, is that she, for example, looked at that tour of duty language in that House report and said this is analogous to officially assigned work. You also have to remember the 1911 Act, which is what COPRA supplanted. I mean, doesn't your tour of duty, and for these people, necessarily have to be making certain that you don't wash the towels with Tide? Well, that was part of what Newcomb was saying. This is a highly regimented conduct that these agents have to engage in. It has to be done in Tide when they put the drug smelling stuff on the towels. The dogs only get a high from marijuana, but not from the other stuff, right? Because they're afraid they'll poison the dog. Well, you don't want these dogs alerting to cars coming into the country with boxes of Tide in them, obviously. That's for sure. And that's why these dogs are trained the way they are. That's why the procedures are very rigorous. But my point is, your tour of duty is you've got to come to work in the morning with a clean towel that hasn't been washed in Tide. So if that's your tour of duty, then why isn't this work officially assigned? Because you heard the government admit a little while ago that they were not officially assigned to do this work.  The government's counsel doesn't know why it wasn't officially assigned. They just said it wasn't. I make a distinction between suffragette-permitted work and officially assigned work. It's a distinction that exists not just with the government, with private employers, because suffragette-permitted is the safety net that catches employees when they're required to do something. Well, does the FSLA cover officially assigned overtime? FSLA. FSLA. Ever officially assigned? Yeah. Sure. Sure. Absolutely. The regulation lists, in fact, all of the ways that you can get paid under the FLSA, and one of them is for things you do on duty, and one of them is for works that are suffragette-permitted that you're allowed to do. My point is that I would assume that under FSLA you get overtime if you had officially assigned duties. Like let's say you were officially assigned to clean your weapon, and it turned out that you didn't have time to clean your weapon on the 8-hour shift. You cleaned your weapon at home, and the agency knew you were cleaning it at home. I would think you'd get FSLA overtime for that, wouldn't you? Not in this situation. No, I understand, but generally, assuming that cleaning your weapon was a required work. Sure. I do other law enforcement cases where they're required to do the same thing, and we don't have COPRA, you know, city law enforcement. Well, does officially assigned have a meaning in FSLA that's different from suffragette-permitted? As I read it, it does. No, wait, the term isn't used in the FLSA. No, but it's analogous to when the FLSA makes distinctions between overtime that employees are required to work on the clock and they're not paid for as compared to overtime they're suffragette-permitted, they're allowed to do off the clock. There is a distinction there in the FLSA between those two types of uncompensated overtime. What's the difference? The difference really is they're both compensable under the FLSA, but the difference again is suffragette-permitted is that safety net. But under the FLSA it doesn't make any difference whether it's something you were ordered to do directly or suffragette-permitted. That's just not a distinction that makes any difference under the FLSA, right? It makes a difference in that people would not be getting paid for the work they were allowed to perform sort of unofficially, if you want to call it that, if it was not for the regulation and the law itself that provide for suffragette-permitted overtime. No, but what I'm saying is the FLSA, there are no consequences in the FLSA regime depending on whether the work is suffragette-permitted or directly ordered, right? You're saying is it the same damage scheme? The whole thing is the same, right? It is the same damage scheme. If anything, I'll say it's a little more difficult to prove suffragette-permitted overtime, but clearly in this case we did so, and Judge Sheila correctly found that we had done so. Well, why isn't the best interpretation of this statute that COPA is designed to be exclusive, but that it has the same breadth of coverage in terms of work that the FLSA has? Well, then why is that language officially assigned in there at all? And why does it talk in there about that work as compared to what it could say, which is all work? And why does it talk about not being paid? Basically what it says is you don't get paid twice. If you've been paid under COPA for officially assigned work, then you don't get paid again for that work under another law. That's basically the plain meaning of the statute the way it's written. And I think all of these congressional and tech questions go to the issue of what does Congress do when they create an FLSA exemption, and we've got lots and lots of examples of that, and they don't look remotely like the situation we're here on today. If you look through Section 213 of the Fair Labor Standards Act— But it's not really responsive to my question, because what I'm saying is if you interpret COPA as having the same coverage that officially assigned is given the same breadth as the FLSA itself, then it makes sense that it would be an exclusive scheme, and you don't have to worry about the fact that COPA provides for double overtime and the FLSA requires triple overtime because they're the same coverage, and you only get what you get under COPA. Why isn't that the correct interpretation of the statute? Well, Your Honor, for all the reasons I've been telling you already, it's a question of the plain meaning of the statute. It's a question of what does Congress do when they create FLSA exemptions, and have they done that here? Has that process happened here? It clearly has not. All FLSA exemptions are clearly unambiguously set forth. They're in the FLSA itself. There's a great example the NTEU gave you in their amicus brief where they talked about LEAP pay, law enforcement availability pay. What did Congress do when it changed the FIPA to give criminal investigators, federal criminal investigators, availability pay, but it didn't want them to also have FLSA pay? It simultaneously amended FIPA and the FLSA, added to Section 213 and expressed clear, concise, unambiguous exemption in the law and simultaneously said in FIPA you get this pay. If that's what Congress wanted to do, they could have done exactly the same thing. Well, doesn't that lead in the direction that I'm suggesting, that you wouldn't have to worry about an exemption if the coverage was the same, right? Well, you do have to worry about an exemption, though, when the situation is what it is here. As you've heard, the government has taken the position. They basically said the same thing here today that my clients were told. My clients were told this is a part of the job you do and you don't get paid for it. They were told that for years and years when they complained about it. That's what Judge Hewitt found, and that's why she found willfulness in this case. When you've got that situation, which is the situation we've got, then you have to say thank goodness we've got the FLSA and suffered and permitted overtime because that's the safety net that catches these guys, these men and women, and makes sure they do get paid for their time. But your problem is that COPA itself doesn't have a willfulness provision in it, right? It doesn't have a good faith provision. It doesn't have a liquidated damage provision. So if somebody orders you to do work and you're not paid for it, even if the supervisor absolutely knows that you should have been paid for it, there's no way under COPA that you can get a doubling of the damages, right? Well, under your interpretation, there would be no way under COPA you would get paid at all. And that can't have been the meaning of Congress. No, you get the double time under COPA. But under your interpretation, there's no provision under COPA when the work is directly over work 9 to 5 and the supervisor doesn't put in the pay slip, the guy doesn't get compensated, even though that's the quintessential willful violation. There's no way under COPA that you can get liquidated damages. You just get the two times, right? I think you would get two times. You would get prejudgment interest, I believe, as well. But you wouldn't get liquidated damages as under the FLSA, right? You would not, that's true. But it's not automatic under the FLSA either. I mean, that's not something you get just because you ask your employer for it. That's something you've got to go through a whole big process that we're now going through to get. But you're not, but when the last thing that Judge Hewitt, the way it was left was that both sides would agree as to the damages. Has anything happened there or are you waiting for this appeal? No, we did agree. At what rate? At the time and a half? At triple time? We agreed on the basic pay and the liquidated damages that are pretty much automatic. You just double that. You say double, but you're under FLSA, so that's one and a half. Well, it's one and a half times the regular rate of pay for the hours. And there's a whole issue we didn't get a chance to talk about here about good faith approximations, which, but that's separate. I'm really just asking whether, in fact, we have talked to assume, perhaps, that the one and a half would be doubled to treble over time. And so my question was, is it in fact being measured at that rate? I gather from what you said, the answer is no. Under Judge Hewitt's order, it is because she ordered liquidated damages. You get triple time. So that is in the negotiation, or you say you've only negotiated the hours? Well, with the judge's direction, we agreed after the trial on the number of hours. She did, and it's important to note, she did cut down the hours in many respects, and that's in her opinion. She certainly gave us far from everything we were claiming. Some claims she eliminated completely, and even the claims she recognized she cut down. I wasn't asking that. I really was interested as to whether, with the hours on which you've agreed, whether the damages are being measured as triple over time. I recognize there's some logic to that. I wouldn't describe it that way. That's what it amounts to, isn't it? Well, the liquidated damages are a penalty. Yeah, yeah, I understand, but that's what it amounts to. It's three times the basic hourly rate, right, is what you're claiming? It is. It is a penalty for violating the law. Okay. And if you didn't have that penalty, employers would simply violate the law at will. All they had to do was pay the money when they got caught in the end. All right. Thank you, Mr. Curry. Thank you very much. Ms. Hogan. Thank you, Your Honor. Page 27 of the joint appendix is the judgment that the court entered, which lists damages at time and a half and then also has a column for liquidated damages. So I just bring that to the court's attention. I understand, but my question was what was the rate? Time and a half and then timing that, but doubling that for the liquidated damages. Okay. Congress can be presumed to be aware of the suffer and permit concept in the law, and so the fact that Congress limited COFRA overtime to officially assigned work is indicative of an intent to exclude the kind of payment for the work that the plaintiffs claim, that Congress intended something narrower, which is what we have in the COFRA statute. I would like to go back to... Well, if it's as easy as that, why didn't they just write the statute to say a customs officer who performs work in excess of 40 hours a week shall be compensated the hourly rate of pay equal to two? I mean, they didn't need this officially assigned language in the statute. I think that the way that Your Honors have stated it, work over 40 hours a week would include the suffer and permit type of overtime that... Also, it would then comport with the interpretation of the statute that Judge Zikes suggested it might carry. If the statute had simply said someone is officially assigned to perform work in excess of 40 hours, take out officially assigned, anybody who performs work in excess of 40 hours gets two times pay, and then the next section says anybody who got overtime under A can't have overtime under anything else. Then it would have been exclusive, right? Well, no, Your Honor, and I think the interpretation of C2 to just preclude sort of simultaneous compensation doesn't do anything more than A1 did, which is to say when you work officially assigned overtime, you are entitled to double time compensation, no more, no less. Right, but under your construction, if you're unlucky enough to be required to do some work that's not officially assigned, and you're unlucky enough to have to do that work after the 8-hour workday, you don't get paid for it. If you don't ask to be officially assigned, you don't get paid for it, and if you come to work not having done that work at home, you get fired. So it's a really great catch-22, isn't it? Well, I think we understand the issues. Thank you, Ms. Hogan and Mr. King. Thank you, Your Honor. Thank you very much.